OPINION OF THE COURT
Dineen A. Riviezzo, J.
Respondent Gary C. is the subject of a petition for sex offender civil management pursuant to article 10 of the Mental Hygiene Law. Respondent waived a probable cause hearing and conceded that he currently suffers from a mental abnormality as defined by article 10 of the Mental Hygiene Law. A dispositional hearing pursuant to Mental Hygiene Law § 10.07 (f) was held on October 17, 2016, December 13, 2016, December 21, 2016 and January 4, 2017. Upon consideration of the entirety of the hearing testimony including the parties’ summations, for the reasons set forth below, the court finds that the *1019 State has met its burden to prove that respondent is a “[d]angerous sex offender requiring confinement” as that term is defined in Mental Hygiene Law § 10.03 (e).
Procedural History
As stated in the article 10 petition for civil confinement filed on October 19, 2015, respondent pleaded guilty on February 14, 2011 to course of sexual conduct against a child in the second degree and endangering the welfare of a child. On March 2, 2011, respondent was sentenced to a term of imprisonment of five years upon the felony conviction and one year upon the misdemeanor conviction. Respondent was also sentenced to five years of postrelease supervision.
Prior to his release from incarceration, the Department of Corrections and Community Supervision (DOCCS) gave notice to the Office of Mental Health (OMH) and the Office of the Attorney General that respondent may be a detained sex offender and was nearing anticipated release. DOCCS notified the respondent that he had been identified as a possible detained sex offender and he was referred to a case review team to evaluate whether he required civil management upon his release from prison.
On September 24, 2015, a psychiatric examination of the respondent was conducted by Dr. Jennine Martinez, a licensed psychologist employed by OMH. Dr. Martinez interviewed respondent via video conference, and reviewed numerous records from DOCCS, OMH and various law enforcement agencies. Using the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V), Dr. Martinez diagnosed respondent with the following disorders or conditions: pedophilic disorder, non-exclusive type, sexually attracted to females; antisocial personality disorder (ASPD); and stimulant use disorder, moderate, in full sustained remission, in a controlled setting. Dr. Martinez also found that respondent meets the criteria for the condition of psychopathy. Dr. Martinez further considered but did not assign the diagnosis of other specified paraphilic disorder, hebephilia.
As a result of Dr. Martinez’s evaluation, the case review team concluded that respondent has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i) and recommended civil management. The State filed the instant article 10 petition which was supported by the evaluation report of Dr. Martinez. On September 19, 2016, respondent waived a prob *1020 able cause hearing and admitted in a plea that he is a detained sex offender who suffers from a mental abnormality as defined by article 10 of the Mental Hygiene Law.
A dispositional hearing was conducted before this court on October 17, 2016, December 13, 2016, December 21, 2016 and January 4, 2017 in order to determine whether respondent is a dangerous sex offender requiring confinement or a sex offender subject to strict and intensive supervision and treatment (SIST) pursuant to Mental Hygiene Law § 10.07 (f). At the hearing, the State offered the testimony of Dr. Martinez and Dr. John Allen Thomassen, the court-appointed examiner. Dr. Thomas-sen agreed with Dr. Martinez that respondent suffers from a mental abnormality. He concluded that respondent’s DSM-V diagnoses were pedophilic disorder, non-exclusive type attracted to females; ASPD; and cocaine use disorder. Both of the State’s experts concluded that respondent was a dangerous sex offender requiring confinement. Dr. Leonard Allen Bard testified on behalf of the respondent. Dr. Bard also diagnosed respondent with pedophilic disorder, but did not find any other diagnosis. Dr. Bard concluded that respondent was not a dangerous sex offender requiring confinement.
Respondent’s Criminal History
In 1984, respondent was convicted of attempted sexual misconduct and received one year of probation (petition ¶ 15; Thomassen tr at 7). The victim was a 15-year-old girl that he took to his mother’s house (Thomassen tr at 7). Respondent admitted during sex offender treatment that he met the victim at a club and that she wanted sex if he would give her alcohol and marijuana (Thomassen tr at 7). Respondent also admitted that he was getting high at the time (Thomassen tr at 7). Respondent claims that in the midst of having sex with the victim, she told him to stop. Respondent didn’t want to stop because he already paid her (Thomassen tr at 7). Respondent also stated that she was a prostitute (Thomassen tr at 7). Respondent further claimed that the victim swung a bottle at him and he hit and injured her nose (Thomassen tr at 7).
In 2006, respondent was convicted of sexual abuse in the third degree, criminal sex act in the second degree, sexual abuse in the first degree, and sexual abuse in the third degree (petition ¶ 15). Respondent received four years’ incarceration for sexual abuse in the first degree, one year of incarceration for criminal sex act in the second degree and 60 days for sexual *1021 abuse in the third degree (petition f 15). During this incarceration, respondent completed a six-month sex offender treatment (Thomassen tr at 22).
The 2006 conviction involved four girls who were sisters and the offenses occurred between 2004 and 2006 (Thomassen tr at 8). At the time that respondent was arrested for these offenses, the victims were aged 17, 14, 14 and 5 (Thomassen tr at 8). Respondent sexually offended against one of the 14-year-old victims by touching her breast, putting his mouth on her vagina, putting his mouth on her breast and putting his penis near her vagina (Thomassen tr at 8). Respondent also put his mouth to the vagina of the five-year-old victim (Thomassen tr at 8). Respondent admitted having sexual contact with the 17 year old, as well as the two 14 year olds, and the five year old over the stated period (Thomassen tr at 9).
On August 14, 2009, respondent was released on parole. From 2009 until his arrest in 2011, respondent was on an intensive reporting schedule with his parole officer and he was engaging in a community-based sex offender treatment program at the Shiloh Sex Offender Treatment Program, both individual and group treatment (Thomassen tr at 22; Martinez tr at 11). Respondent was not permitted to be around children and was required to comply with urine analysis for substance abuse treatment (Martinez tr at 35).
On August 24, 2009, only 10 days after he was released on parole, respondent began sexually abusing his grandniece (Martinez tr at 10). Respondent continued the abuse until he was arrested in 2011 (Martinez tr at 10). The victim was the daughter of his nephew (Thomassen tr at 10). Respondent had a key to his nephew’s apartment and, on August 24, 2009, January 8, 2011 and January 9, 2011, respondent went to the apartment where the eight-year-old victim was living (Thomas-sen tr at 10). Respondent admitted to placing his finger in the victim’s vagina on each occasion (Thomassen tr at 10). During the time respondent was sexually abusing the eight-year-old victim, he was attending the Shiloh Sex Offender Treatment Program (Thomassen tr at 10).
In 2011, respondent was convicted of course of sexual conduct against a child in the second degree (Thomassen tr at 9). On March 2, 2011, respondent was sentenced to a term of imprisonment of five years upon the felony conviction and one year upon the misdemeanor conviction. Respondent was also sentenced to five years of postrelease supervision. The 2011 *1022 conviction is the qualifying offense for purposes of article 10. In 2014, respondent participated in sex offender treatment while incarcerated at Gowanda Correctional Facility and completed the program in 2015 (Thomassen tr at 22).
Respondent also has various non-sexual offenses. In 1978, respondent was arrested for attempted robbery in the second degree and was adjudicated a youthful offender for a plea to attempted grand larceny in the third degree. Respondent received one year of probation (petition ¶ 15). In 1983, respondent was convicted of trespass and received a conditional discharge (petition ¶ 15). In 1984, respondent was convicted of disorderly conduct and received 15 days’ incarceration (petition ¶ 15). In 1998, respondent was convicted of harassment in the second degree and received a conditional discharge and order of protection (petition ¶ 15; Thomassen tr at 11). In 2003, respondent was convicted of disorderly conduct and received a fine (petition ¶ 15). In 2004, respondent was again convicted of disorderly conduct and received a conditional discharge and five days’ community service (petition ¶ 15). Respondent reported that he had two other arrests (Thomassen tr at 11). Respondent stated that he was arrested for a fight in school when he was nine years old (Thomassen tr at 11). When he was 14 years old, respondent stabbed someone who was bullying him and he was given three years’ probation (Thomassen tr at 11).
Testimony at Dispositional Hearing
At the hearing held pursuant to Mental Hygiene Law § 10.07 (f), the State offered the expert testimony of Dr. John Allen Thomassen and Dr. Jennine Martinez, each licenced to practice psychology in the State of New York. Dr. Martinez is employed as a psychiatric examiner with the New York State Office of Mental Health, Division of Forensic Services (Martinez tr at 3). Dr. Thomassen has a private psychology practice specializing in forensic evaluations of sex offenders (Thomassen tr at 4). Each doctor testified that they reviewed substantial records concerning the respondent including, but not limited to, records from police departments, probation agencies, correctional facilities, psychiatric facilities and Shiloh Sex Offender Treatment Program (Thomassen tr at 6). Dr. Martinez conducted an interview of respondent on September 4, 2015 (Martinez tr at 25). Dr. Thomassen requested to interview respondent; however, respondent refused (Thomassen tr at 8).
*1023 Respondent offered the expert testimony of Dr. Leonard Allen Bard, a licensed psychologist. Dr. Bard similarly reviewed records from police departments, probation agencies, correctional facilities and psychiatric facilities relating to respondent (Bard tr at 144). Dr. Bard conducted an interview with respondent on July 20, 2016 (Bard tr at 142).
The court summarizes the testimony of each expert below: Dr. John Allen Thomassen
Dr. Thomassen diagnosed respondent with pedophilic disorder, non-exclusive type attracted to females (Thomassen tr at 12). Dr. Thomassen explained that a pedophilic disorder is a DSM-V diagnosis characterized by individuals with
“persistent, recurrent, intense sexual urges, behaviors, fantasies to prepubescent children; has them over a period of six months; is over five years older than the intended victim or the individual that’s the source of the arousal; and that that arousal— either the arousal or the person’s behaviors cause significant distress, social maladjustment and such” (Thomassen tr at 12).
Dr. Thomassen’s opinion was informed by the following facts:
• From 2004 to 2011, respondent had sexual relations with four prepubescent children and he acknowledged that he was sexually aroused to the children (Thomassen tr at 13);
• Respondent acknowledged that he thought or fantasized that the four children he was abusing, between 2004 and 2006, may replace his wife (Thomassen tr at 13);
• Respondent acknowledged that he was grooming the children and, in some way, grooming the parents to be able to be near the children (Thom-assen tr at 14);
• In 2006, respondent was found with a computer disc or thumb drive of books of pedophilia (Thom-assen tr at 14);
• In 2015, during sex offender treatment at Gow-anda Correctional Facility, respondent stated that the threat of returning to prison did not deter him from committing offenses against the eight-year-old girl he abused while out in the community on parole (Thomassen tr at 14); and
*1024 • Respondent’s statement, made one month before completing sex offender treatment in 2015, that “this may come back to haunt me, but that if I’m returned to the community, I’m likely to do the same thing again” (Thomassen tr at 14).
Thus, Dr. Thomassen concluded that respondent has persistent, intense sexual urges towards children, the urges have been present for a long time, he has acted on those urges, and the urges are strong enough that respondent may have difficulty refraining from acting upon the attraction if he is near children (Thomassen tr at 14).
Dr. Thomassen also diagnosed respondent with ASPD (Thom-assen tr at 17). In Dr. Thomassen’s opinion, respondent met at least three of the seven criteria for this diagnosis. Dr. Thomas-sen testified that there is ample evidence in the record that respondent has disregarded the rules of society, demonstrated a degree of disregard for the safety of others, and exhibited a degree of irritability, impulsivity and irresponsibility (Thomas-sen tr at 17-19). Furthermore, Dr. Thomassen found evidence of a conduct disorder prior to the age of 15 based on respondent’s admission that he stabbed someone when he was 14 years old and was arrested (Thomassen tr at 19).
Finally, Dr. Thomassen diagnosed respondent with a cocaine use disorder based on records establishing that respondent went to two or three inpatient substance abuse treatment programs between the ages of 24 and 28 (Thomassen tr at 21). Respondent was diagnosed with crack cocaine use in one of the inpatient treatments (Thomassen tr at 22). Dr. Thomassen noted that respondent failed to complete each of these treatment programs (Thomassen tr at 21).
In evaluating whether respondent has “serious difficulty in controlling such (sex offending) conduct” as well as to determine whether respondent has “such an inability to control behavior” that he is likely to be a danger to others and to commit further sex offenses, Dr. Thomassen considered two actuarial risk assessment tools, the Static-99R and the Static-2002R (Thomas-sen tr at 23). Dr. Thomassen scored respondent a 6 on the Static-99R which was a high risk (Thomassen tr at 23, 26). Dr. Thomassen explained that score on this assessment is in relation to all sex offenders and respondent’s score places him in the 92% to 96%, so 92 to 96 sex offenders scored lower than respondent (Thomassen tr at 27). In this case, the percentage of risk is 3.77 times the risk of the typical sex offender and “that *1025 would be considered the base rate in the community for predicting a future sex offense for someone previously convicted of a sexual offense” (Thomassen tr at 27).
Dr. Thomassen also scored respondent using the Static-200211 risk assessment tool (Thomassen tr at 27). Respondent’s total score on the Static-2002R was an 8 for moderate-high risk which places respondent in the 94% to 97.2% (Thomassen tr at 33-34). Respondent’s relative risk of re-offending is five times the risk of a typical sex offender (Thomassen tr at 34).
Dr. Thomassen also evaluated respondent using the Stable-2007 which is an instrument that looks at 13 changeable factors that are “currently accessible characteristics of the individual that research has shown has some predictive power in identifying who may be more likely to sexually reoffend in the future” (Thomassen tr at 35). Respondent received a score of two points on each of the following categories: cooperation with supervision; deviant sexual preference; lack of concern for others; general social rejection; hostility towards women; sex drive or sexual preoccupation; negative emotionality; impulsivity; significant social influences; capacity for relationship stability; and poor problem solving skills (Thomassen tr at 37-46). Respondent’s total score on the Stable-2007 was 19 and generally anyone scoring above a 12 would be considered a high risk (Thomassen tr at 48).
In addition to the risk assessment evaluations that he performed, Dr. Thomassen considered the fact that respondent was diagnosed with psychopathy when determining the likelihood that he would be a danger to others and to commit further sex offenses. Dr. Thomassen stated that there is a direct relationship between psychopathy and the risk of future sexual offense (Thomassen tr at 50). “Psychopathy is a good predictor for overall offenses. It has been shown to be connected with sexual offenses” (Thomassen tr at 50).
Finally, Dr. Thomassen considered respondent’s participation in sex offender treatment as a factor that might predict whether or not he was likely to re-offend. Dr. Thomassen gave respondent credit for completing treatment in 2015 but concluded that there are many indications that respondent has more work to do (Thomassen tr at 53). Dr. Thomassen noted that respondent has not demonstrated that he has acquired the skills to control himself (Thomassen tr at 54). Dr. Thomas-sen further opined that
“the distinction between being released in my mind under strict and intensive supervision and treat *1026 ment comes down to two factors, internal factors; does that individual have control of their impulses, have they shown some willingness, interest, and actual behaviors indicative of that control.
“And two, are they able to accept the supervision and speak with providers, supervisors if they should get into some risky situations in which they have to manage those assumed sexually deviant impulses.” (Thomassen tr at 55.)
Here, respondent has stated that he uses thought distractions or thought stopping (Thomassen tr at 54). However, when asked what he does to stop offending he said that he walks out of the treatment room if he sees children on TV (Thomassen tr at 54). Dr. Thomassen further stated that he is not confident that respondent can manage in the community right now. Dr. Thomassen noted that respondent’s current treatment providers are stating that he is making minimal progress and that he is not exhibiting the same level of commitment to discussing his offenses as he did in prior sex offender treatment (Thomas-sen tr at 53). Dr. Thomassen explained the stages of change as follows: “There is pre-contemplation. You’re not quite sure if you want to change. Contemplation. You think you might want to change. Preparation. Yeah, you’re ready to change. Action. I’m going to do things to change. Maintenance. Not only doing things to change, I’m going to keep doing.” (Thomassen tr at 123.) Dr. Thomassen opined that respondent is in the preparation stage of change and, in some areas, he has progressed to the action stage (Thomassen tr at 123). Based on respondent’s progression at Gowanda, Dr. Thomassen thinks that with further treatment, respondent may be able to manage in the community (Thomassen tr at 55).
Dr. Thomassen noted that respondent still has cognitive distortions. For example, in the recent treatment notes, respondent indicated that “the reason that he offended against children in the past was because it was some sort of validation that he had, that it wasn’t about sex, and he said that it was also about teaching them about fidelity of relationships, how to stay with one person” (Thomassen tr at 99). This statement indicates to Dr. Thomassen that it is not clear whether respondent has compassion for his victims (Thomassen tr at 100).
In addition, respondent spends treatment time “griping” about being there rather than spending treatment time working on the things that the group leaders want him to work on (Thomassen tr at 111). Other notes indicate that respondent *1027 defers responsibility for his treatment as evidenced by his statement that “there is nothing I can do because it going to come down to a judge, so it may not even matter what I do here” (Thomassen tr at 111).
In sum, Dr. Thomassen stated that “[t]he fact that one month from being released from treatment [respondent] says that, well, gee, the prison doesn’t really affect me and conditions are the same, I’m likely to offense [sic] again, that’s a bit telling, I guess” (Thomassen tr at 53).
Accordingly, Dr. Thomassen concluded that respondent has “such an inability to control behavior” that he is likely to be a danger to others and to commit further sex offenses.
Dr. Jennine Martinez
Dr. Martinez diagnosed respondent with a pedophilic disorder which she described as an individual who has thoughts, feelings or behavior that cause clinical impairment over a six-month period of time (Martinez tr at 11-12). Further, pedophilic disorder is a chronic condition and needs to be addressed in treatment (Martinez tr at 12). Dr. Martinez opined that respondent is sexually aroused to prepubescent female children (Martinez tr at 11). Specifically, respondent’s youngest victim was five years old and the victim of the instant offense was eight and nine years old during the offending period (Martinez tr at 11-12).
Dr. Martinez also diagnosed respondent with ASPD which she defined as a pervasive pattern of disregard for or violation of the rights of others (Martinez tr at 12-13). ASPD includes “engaging in behaviors that are grounds for arrest as well as impulsivity, deceitfulness, lack of remorse, irresponsibility and aggressiveness or irritability” (Martinez tr at 13). “It’s also important to demonstrate that there were some behaviors that occurred prior to the age of 15” (Martinez tr at 13). The fact that respondent has been arrested for multiple offenses, including violent offenses, drug-related offenses and sex offenses, helped form the basis of her diagnosis (Martinez tr at 13). Respondent engaged in violence against strangers as well as against his ex-wife and he continues to minimize or refuse to acknowledge responsibility for his offenses (Martinez tr at 13).
Dr. Martinez also found that respondent meets the criteria for the condition of psychopathy. Dr. Martinez completed a Psychopathy Checklist Revised evaluation of the respondent and he received a score of 30, which is indicative of high *1028 psychopathic traits (Martinez tr at 9, 14). Dr. Martinez also diagnosed respondent with stimulant use disorder, moderate, in full sustained remission, in a controlled setting.
In evaluating respondent for “serious difficulty in controlling such conduct” as well as to determine whether respondent has “such an inability to control behavior” that he is likely to be a danger to others and to commit further sex offenses, Dr. Martinez examined both actuarial tools, such as the Static tools, and respondent’s dynamic risk factors (Martinez tr at 7). Static-99R is an actuarial tool that evaluates static or historical elements that have been found to be connected with recidivism (Martinez tr at 8). An average score of a typical sex offender on the Static-99R risk assessment instrument would be a score of 2 (Martinez tr at 20). Dr. Martinez evaluated respondent using the Static-99R and scored respondent a 6, which indicates that respondent has a 3.77 times higher risk of sexually recidivating (Martinez tr at 20). Some of the criteria upon which respondent was scored were prior non-sexual violence; prior sex offenses; four or more prior sentencing dates; having unrelated victims; and stranger victims (Martinez tr at 8). Because he is 56 years old, Dr. Martinez gave respondent one negative point for a total of 6 (Martinez tr at 8).
Dr. Martinez also considered respondent’s dynamic risk factors which have been found to be connected with recidivism. Unlike the static actuarial evaluations, these factors can be amenable to change and would be the items focused on in treatment to decrease risk for sexual recidivism (Martinez tr at 9). Dr. Martinez identified several dynamic risk factors relevant to respondent’s risk of re-offending sexually such as his noncompliance with supervision (respondent completed the instant offense while he was under parole supervision in the community), general self-regulation problems, and lifestyle impulsivity, as well as deviant sexual interest in multiple prepubescent children (Martinez tr at 9).
In addition to the risk assessment evaluations that she performed, Dr. Martinez considered the fact that respondent was diagnosed with psychopathy when determining the likelihood that he would be a danger to others and to commit further sex offenses. Dr. Martinez stated that individuals with psychopathy demonstrate more callousness, view people as objects meant to satisfy whatever needs they experience at that moment, and lack remorse (Martinez tr at 14). Further, research indicates that individuals who have both sexual devi- *1029 anee, such as respondent’s pedophilic disorder, and high levels of psychopathy are at a high-end risk to sexually re-offend (Martinez tr at 14-15).
In Dr. Martinez’s opinion, respondent’s cognitive distortions support re-offending behaviors (Martinez tr at 9). Dr. Martinez found it very significant that respondent provided a statement to treatment providers that he is willing or going to re-offend in the future (Martinez tr at 10). Specifically, Dr. Martinez cited respondent’s statement made in sex offender treatment in 2015 that if he returns to the community under the same circumstances, he will likely re-offend (Martinez tr at 10). Dr. Martinez noted respondent’s grievance thinking as a particular type of cognitive distortion in which he places blame on other people and on other factors to explain his own negative behaviors (Martinez tr at 21). For example, respondent blamed his nephew for giving him keys to his apartment where he had access to his victim since his nephew knew his history of sex offenses (Martinez tr at 21). Respondent also made statements that his parole officer was to blame for him sexually re-offending (Martinez tr at 22). Respondent blamed his treatment providers claiming that he wouldn’t have sexually re-offended in 2009 if he had been in individual therapy sessions. In fact, respondent was receiving both group and individual treatment at that time (Martinez tr at 22). Respondent was further upset that while out on parole he was required to live in a shelter, and not with his wife, due to a valid order of protection (Martinez tr at 22). Respondent was upset that the parole board did not approve his request to engage in college classes while out on parole and that this also had some kind of connection to his re-offending (Martinez tr at 22).
Dr. Martinez opined that respondent has not adequately addressed his sexual deviance in any sex offender treatment program (Martinez tr at 24). While respondent has engaged in treatment, he has been inconsistent in acknowledging his sexual deviance and generally, respondent does not agree with the diagnosis that he has been given (Martinez tr at 59). For example, at times he says he is attracted to children, and at other times he states that he is not (Martinez tr at 24).
“Even in the course of my interview he says he wasn’t attracted to children, but then he said he used to be attracted to children, but then he said that he should avoid children in the future, but he couldn’t tell me why he should avoid children in *1030 the future” (Martinez tr at 24).
Dr. Martinez testified that respondent’s relapse prevention plan is inadequate to address his risk factors (Martinez tr at 21). Respondent was unable to identify specific risk factors and why they might apply to him, especially in light of the fact that he has made inconsistent statements about whether he is sexually aroused by children (Martinez tr at 21). Respondent told Dr. Martinez that while he was receiving treatment out in the community he couldn’t express himself and couldn’t get the help that he needed because if he admitted that he was going to his nephew’s apartment he would be arrested and his parole would be violated because he was having contact with the child (Martinez tr at 25-26). This demonstrates to Dr. Martinez respondent’s circular thinking about his behavior. In respondent’s view, he couldn’t receive treatment because if he admitted some of his concerning behaviors he would have been held accountable for engaging in those problematic behaviors (Martinez tr at 26). Respondent also admitted that many of his triggers that led to sex offending are unconscious and that he is not aware of them (Martinez tr at 26, 61). Respondent said that he did need help, but exactly what he needed help with only time would tell (Martinez tr at 26). In Dr. Martinez’s opinion, respondent’s abstract opinions demonstrate that respondent lacks a concrete relapse prevention plan that would assist in reducing risk to sexually re-offend (Martinez tr at 26).
Dr. Martinez acknowledged that respondent has been participating in sex offender treatment since he entered Central New York Psychiatric Center (CNYPC) but only recently has identified his offending cycle (Martinez tr at 56, 62). Specifically, respondent befriends someone who has access to respondent’s potential victim pool and then grooms that person to see him as trustworthy (Martinez tr at 62). Grooming can take place over a period of years (Martinez tr at 63). While this may be true, respondent’s current acknowledgments contradict other statements in which he claimed that his triggers are unconscious (Martinez tr at 63).
Ultimately, Dr. Martinez concluded that a regimen of SIST would not reduce respondent’s risk based on the following:
“I think that when we look at the last time that [respondent] was in the community he was under a very intensive reporting schedule from the parole, he was engaged in out patient sex offender treatment, both group and individual, and he was seem *1031 ingly following all of these rules, but he was also sexually abusing an eight-year-old victim within ten days of returning to the community.” (Martinez tr at 23.)
Finally, Dr. Martinez stated that respondent did not receive any disciplinary violations during his most recent sentence (Martinez tr at 31). However, respondent did exhibit defiant behaviors while at CNYPC which, in Dr. Martinez’s opinion, were examples of antisocial behaviors (Martinez tr at 31).
Dr. Leonard Allen Bard
Respondent offered the expert testimony of Dr. Leonard Allen Bard, a licensed psychologist. Dr. Bard similarly reviewed records from police departments, probation agencies, correctional facilities and psychiatric facilities relating to respondent (Bard tr at 144). Dr. Bard conducted an interview with respondent on July 20, 2016 (Bard tr at 142). By report dated September 29, 2016, Dr. Bard diagnosed respondent with a pedophilic disorder. Dr. Bard did not assign a diagnosis of ASPD, as did the State’s experts, because he concluded that given his current presentation, his age and the lack of any significant behavioral problems he did not feel that respondent currently meets those criteria (Bard tr at 146).
Dr. Bard concluded that respondent was not such a dangerous sexual offender that he required confinement, but that he could be managed successfully under SIST (Bard tr at 143, 145). Dr. Bard stated that it was his understanding of the law that only individuals who show an inability to control their sexual impulses can be confined and that those who have difficulty controlling their sexual impulses are better dealt with under SIST (Bard tr at 147). As discussed below, the court does not completely agree with Dr. Bard’s interpretation.
Similar to the State’s experts, Dr. Bard evaluated respondent’s risk of re-offending using the Static-99R actuarial risk assessment tool (Bard tr at 148). Dr. Bard scored respondent a 5, one point lower than each of the State’s experts. Dr. Bard stated that a score of 5 indicates that respondent falls in a group whose recidivism rate over five years was between 11% and 15% (Bard tr at 148).
Dr. Bard also evaluated respondent with an actuarial tool called MATS-1 which incorporates some of the items from the Static-99R (Bard tr at 203). Dr. Bard gave respondent a score of 8 on the MATS-1 which indicates a risk assessment of 23% over eight years (Bard tr at 204).
*1032 Dr. Bard stated that he does not use the Stable-2007 because, in his opinion, it is too subjective as compared to the Static ac-tuaríais (Bard tr at 171). Dr. Bard generally disagreed that the dynamic risk factors on the Stable-2007 were in fact valid risk factors that predict recidivism and discounted them even though he acknowledged that respondent had trouble in those risk areas (Bard tr at 174). For example, concerning the dynamic risk factor entitled “relationship stability,” Dr. Bard stated that respondent had relationships in the past which should be a positive factor. However, Dr. Bard admitted that the quality of those relationships have been variable, thus making it more negative. In fact, on cross-examination Dr. Bard agreed that people in an adult relationship are less likely to re-offend. However, it was noted that when respondent re-offended between 2009 and 2011 he was in a relationship with an adult woman (Bard tr at 202). Dr. Bard disputed whether that adult relationship was a sexual one (Bard tr at 203).
Dr. Bard explained that the key to evaluating dynamic risk factors is to measure change (Bard tr at 153). Dr. Bard considered how well respondent has done in managing his sexual impulses and in managing his non-sexual impulses, how he has changed his thinking about himself and his offending, and his improved performance in treatment (Bard tr at 153). For example, Dr. Bard considered that respondent was able to self-regulate recently in CNYPC when he was provoked by someone and he did not retaliate (Bard tr at 155). According to Dr. Bard, self-regulation is important to the risk of recidivism in the community “because the research has shown that those individuals who had trouble managing their nonsexual impulses are relatively higher risk to re-offend sexually” (Bard tr at 155). Dr. Bard conceded that while respondent did not have any problems self-regulating when he was incarcerated from 2006 to 2009 he still re-offended when he was released (Bard tr at 192). Dr. Bard further believes that respondent evidenced sexual regulation in that he has shown control over his sexual impulses. Respondent has not been cited for acting out sexually and has not engaged in sexual encounters while incarcerated (Bard tr at 155). On cross-examination, Dr. Bard acknowledged that respondent had never been cited for possessing child pornography or for acting out sexually during his first incarceration; however, respondent, nonetheless, re-offended when he was released on parole (Bard tr at 180).
Concerning potential attitudes tolerant of offending or cognitive distortions, Dr. Bard claims that respondent has come to *1033 realize that his sex offenses were selfish and benefitted only himself (Bard tr at 157-158). In the past, respondent believed that what he was doing was good for him and for the child. Dr. Bard sees progress in that respondent has been able to accept himself as a pedophile although he fought that diagnosis in the past (Bard tr at 158). Since his most recent offense he has been forced to accept that he has an attraction to young girls (Bard tr at 159). Dr. Bard did not know when respondent first accepted his diagnosis, but guessed that it could have been as recently as July 2016 during Dr. Bard’s interview (Bard tr at 179).
Concerning respondent’s participation in sex offender treatment, Dr. Bard acknowledged that respondent has been credited with being in the preparation phase only as recently as November 2016 and only partly in the action stage (Bard tr at 162). Dr. Bard acknowledged that it has taken respondent far too long to admit his problems and to address them, but credits respondent for doing so now (Bard tr at 162). Dr. Bard further acknowledged that respondent’s participation in the Shiloh Sex Offender Treatment Program in 2009 was terrible. Respondent was not actively involved nor was he participating in any meaningful way (Bard tr at 165).
Dr. Bard addressed respondent’s statement in which he admitted that if he was released with the same conditions he would most likely re-offend (Bard tr at 167, 189). Dr. Bard does not believe that respondent currently feels that way about himself. However, Dr. Bard admitted that he did not ask respondent about this statement at the time of his interview (Bard tr at 167). Further, Dr. Bard acknowledged that respondent made this statement in May 2016 towards the end of his treatment (Bard tr at 188-189).
In Dr. Bard’s opinion, respondent is
“aware now that this is something that he has to take seriously, that he can’t just say it isn’t going to happen again, I’ll be fine, because he knows that that’s not true anymore; that he can’t put himself in certain situations that are high risk, that he had to use the intervention that he has learned in treatment, to talk in therapy to avoid situations, to in general be much more aware of what he is thinking and feeling rather than just holding everything in” (Bard tr at 168).
Concerning his re-offense after he was released on parole, Dr. Bard credits respondent’s account of the sexual offenses *1034 rather than the dates in the indictment and acknowledged that he would be more concerned if the re-offense really did happen within 10 days after his release on parole (Bard tr at 187).
Discussion
As a threshold matter, respondent has conceded that he currently suffers from a mental abnormality as defined by article 10 of the Mental Hygiene Law. A mental abnormality means “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i] [emphasis added].) Thus, the court is now authorized to order one of two dispositional outcomes—confinement or an outpatient SIST regime (see Mental Hygiene Law § 10.07 [f]; Matter of State of New York v Nelson D., 22 NY3d 233 [2013]; Matter of State of New York v Myron P., 20 NY3d 206, 212 [2012]; State of N.Y. ex rel. Harkavy v Consilvio, 8 NY3d 645, 652 [2007]).
The State seeks to confine respondent. To do so, the State bears a heavy burden to establish by clear and convincing evidence that the respondent sex offender has a mental abnormality “involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility” (Matter of State of New York v Nelson D., 22 NY3d 233, 238 [2013] [emphasis added]; Mental Hygiene Law § 10.03 [e]). If the State meets its burden, and the judge orders confinement the respondent “shall be committed to a secure treatment facility for care, treatment, and control until such time as he or she no longer requires confinement” (id.). If the State fails to meet its burden, and the judge determines that the sex offender does not meet the statutory definition of a dangerous sex offender requiring confinement, then the judge must order a regimen of SIST (see id., see also Myron P., 20 NY3d at 213; Harkavy, 8 NY3d at 651).
To the extent that respondent argues that Matter of State of New York v Michael M. (24 NY3d 649 [2014]) requires the State to show by clear and convincing evidence that respondent has a complete lack of volitional control in order for the respondent to be civilly confined, the court disagrees.
*1035 In Michael M., the Court of Appeals held that the evidence was legally insufficient to justify revoking the respondent’s SIST and imposing secure confinement (.Matter of State of New York v Michael M., 24 NY3d 649 [2014]). The evidence established that respondent missed appointments with his mental health counselor, and lost his employment and his housing in an independent residence because he did not enroll in a required job preparation program (id. at 654-655). While not a violation of SIST conditions, he was engaged in a relationship with a girlfriend who suffered from certain “mental health problems” (id.). As a result of these infractions, which all occurred within one month of his release on SIST, and his failure to answer questions about them, he was discharged from the sex offender treatment program and was arrested for violating his SIST conditions (id.). After a hearing, the Supreme Court determined that the State had proved by clear and convincing evidence that respondent was a dangerous sex offender requiring confinement and revoked his release on SIST while at the same time expressing great criticism of respondent’s SIST team with words such as “animus” and “callousness” (id.).
On appeal, the Court held that respondent’s confinement was based upon legally insufficient evidence and held that the Mental Hygiene Law “clearly envisages a distinction between sex offenders who have difficulty controlling their sexual conduct and those who are unable to control it. The former are to be supervised and treated as ‘outpatients’ and only the latter may be confined” (Matter of State of New York v Michael M., 24 NY3d 649, 659 [2014]). The Court further stated that the testimony tended to show only that respondent was struggling with his sexual urges, not that he was unable to control himself. In support of this conclusion, the Court focused on the violations that were cause for the reevaluation which, as described above, had nothing to do with an ability or inability to control sexual urges—e.g., missed appointments, loss of job, relationship with girlfriend (id.).
This court does not interpret the language in Michael M. quoted in the paragraph above to literally mean that only those respondents found to have a complete inability to control their sex offending behavior can be confined. There are several reasons why that sentence cannot mean a complete lack of volitional control. First, there is the plain language of the relevant definitions in article 10. A respondent is initially subject to an article 10 petition if he has a mental abnormality which, *1036 by definition, requires a person to have “serious difficulty” in controlling sex offending behavior, not a complete inability to do so. Thus, a person cannot be subject to any type of civil management—in the community or while confined—unless there is serious difficulty with volitional control. A “[s]ex offender requiring strict and intensive supervision” is a “detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement” (Mental Hygiene Law § 10.03 [r]). A “[d]angerous sex offender requiring confinement” is defined as
“a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility” (Mental Hygiene Law § 10.03 [e]).
The statute by its plain language does not say a “complete inability” or even an “inability” but “such an inability” (id. [emphasis added]). In accordance with principles of statutory construction meant to give every word in a statute meaning, this language distinguishes those who have “such an inability”—and are therefore dangerous—from those who have only serious difficulty but are not dangerous or are less dangerous and therefore, can be managed on SIST. In sum, to this court, “such an inability” is a matter of degree greater than “serious difficulty” but not necessarily a complete inability. It is further a means of expressing a greater level of dangerous that requires confinement over management in the community.
This interpretation is also supported by Supreme Court precedent upholding the constitutionality of sexually violent civil commitment laws, starting first with Kansas v Hendricks (521 US 346 [1997]), which held that such laws did not violate due process as long as they required proof of a dangerous mental illness or abnormality that resulted from a lack of volitional control. However, as stated so eloquently by Judge Renwick in Matter of State of New York v Frank P. (126 AD3d 150 [1st Dept 2015]),
“Kansas v Hendricks’s reference to lack of control left uncertainty in the governing law—namely, whether a showing that a defendant completely lacked the ability to control himself was necessary to justify civil commitment. Five years later, Kansas v Crane (534 US 407 [2002]) directly answered this *1037 question ....
“[T]he Justices rejected as unworkable the premise that only those with a complete lack of volitional control—who experience ‘irresistible impulséis]’— may be civilly committed {Crane, 534 US at 411-412 [internal quotation marks omitted]). The Court found that most severely ill people retain some degree of volitional control, and ‘[i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities’ {id. at 412). The Court, however, also rejected the Kansas Attorney General’s position that no lack-of-control determination whatsoever is required. ‘[T]here must be proof of serious difficulty in controlling behavior’ {id. at 413).” {Matter of State of New York v Frank P., 126 AD3d 150, 157-158 [1st Dept 2015].)
Thus, the Supreme Court recognized that even those considered to be the most mentally ill retain some degree of volitional control. This court does not interpret the Court of Appeals’ jurisprudence to provide for a more strict interpretation than that provided by the Supreme Court.
Lastly, this court must consider its experiences presiding over a vast array of article 10 proceedings since the statute’s inception, and for the past few years, as the only judge doing so in Kings County. By this court’s recollection, no expert has ever testified that a respondent completely lacks volitional control, and in this court’s estimation, it would be extremely difficult for an expert to opine to a reasonable degree of scientific certainty that a respondent has a complete inability to control sex offending for all the reasons stated by the Supreme Court in Kansas v Crane and Kansas v Hendricks cited above.
Applying these principles here, then, the court finds that the State has met its burden to prove that respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control his behavior, that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.
First, the court credits the fact that respondent has admitted that he has a mental abnormality and now appears to accept his diagnosis of pedophilic disorder. Pedophilic disorder, however, is a chronic condition and needs to be addressed in treatment. Dr. Bard, respondent’s expert, acknowledged that respondent had only just started to make “moderate progress” *1038 on certain goals in the months prior to his interview in July 2016 (Bard tr at 160). As recently as November 2016, respondent was still in a preparation stage and only partly in action stage (Bard tr at 162). Contrary to the respondent’s assertion, the fact that he can point to several treatment notes that show progress does not mean he can be successfully managed in the community.
Rather, the court credits the score of 6 on the Static-99R risk evaluation which indicates that respondent has a 3.77 times higher risk of sexually recidivating, as well as the dynamic risk factors identified by Dr. Martinez. Even accepting the actuarial risk assessment submitted by the respondent, his risk of re-offense can be expressed as 23% over eight years. In addition, Dr. Martinez and Dr. Thomassen both diagnosed respondent with ASPD and Dr. Martinez also found a diagnosis of psychopathy. As stated by Dr. Martinez, research indicates that individuals who have both a sexual deviance, such as respondent’s pedophilic disorder, and high levels of psychopathy are at a higher risk to sexually re-offend.
Moreover, respondent’s cognitive distortions and continued grievance thinking support the conclusion that respondent cannot be adequately managed in the community. Respondent’s inability to identify risk factors that trigger his urges also causes the court to be concerned that he has no true relapse prevention plan.
As previously discussed, respondent has just started—since this petition has been filed—to address his disorder in treatment despite the fact that he completed sex offender treatment while incarcerated. Most telling to the court is the fact that in 2015 while in that treatment he expressed concern that if released under similar circumstances as the last time he was on parole he will re-offend. The court does not agree with Dr. Bard’s assessment of this statement. The statement was made by respondent at the end of sex offender treatment in Gowanda Correctional Facility right before the petition was filed when he was struggling in treatment and not participating in a therapeutically appropriate way.
Further, the court does not agree that respondent has learned how not to offend. Respondent was incarcerated from 2006 to 2009 when he was released on parole. He was receiving treatment in the community until 2011 when he was arrested on the instant offense and had been incarcerated until 2015 when the petition was filed. Respondent’s lack of prison *1039 violations during this last relatively brief incarceratory period does not mean that respondent can be successfully managed in the community especially when respondent’s expert conceded that respondent appears to have accepted his pedophilic diagnosis for the first time during the July 2016 interview with Dr. Bard. While even Dr. Thomassen acknowledges that there will likely come a time when respondent can be successfully managed in the community and will not be a danger to others to re-offend, that time is not now.
Conclusion
The court finds that there is clear and convincing evidence that respondent “is likely to be a danger to others and to commit sex offenses” if not confined. For all of these reasons, the court finds that he is a dangerous sex offender requiring confinement and directs that he be confined in a secure treatment facility operated by the Office of Mental Health.